NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                              :
ROBERTA F. TOWNSEND,          :
                              :
          Plaintiff,          :     Civil No. 05-0136 (RBK)
                              :
     v.                       :     **OPINION**
                              :
COMMISSIONER OF SOCIAL        :
SECURITY,                     :
                              :
          Defendant.          :
_____:


**KUGLER**, United States District Judge:

     This matter comes before the court upon appeal by Plaintiff
Roberta F. Townsend ("Townsend"), pursuant to 42 U.S.C. § 405(g),
for review of a final determination of the Commissioner of Social
Security ("Commissioner") denying her application for disability
insurance benefits ("DIB"). For the reasons set forth below, the
decision of the Commissioner will be affirmed.

## I.   Background and Procedural History

     Townsend, born May 4, 1946, suffers from degenerative
arthritis of both knees, triggered by a fall in a supermarket in
September 2001 and exacerbated by a second fall in February 2002.
(Admin. Rec. ("Rec.") at 192, 119, 153.) Townsend is presently
married and living with her husband in North Cape May, New

Jersey. (Rec. at 189-92.) She is a high school graduate, and, other than a few banking courses, has no formal education beyond twelfth grade. (Rec. at 194-95.)

Until her injury, Townsend and her daughter ran a daycare in her home, where they cared for five to ten children of varying ages from approximately 7:30 a.m. to 5:30 p.m. (Rec. at 196.) This job required Townsend to lift and carry children, and she claims she could no longer continue as a daycare worker after her fall in September 2001. (Pl. Br. at 4; Rec. at 196.) Prior to opening the daycare, Townsend was employed at a bank in various capacities. (Rec. at 196-98.) Townsend served as bank manager beginning in 1983, worked in business development starting in 1993 or 1994, and was transferred to the operations department in 1998. (Rec. at 197-98.) She alleges that she has not sustained any gainful employment since September 2001.

Townsend filed an application for DIB on July 28, 2002, alleging that pain in her knees and depression ensuing from her injury have rendered her unable to work. (Rec. at 46-48; Pl. Br. at 1.) The Social Security Administration ("Administration") denied Townsend's application on December 4, 2002, and her request for reconsideration on January 8, 2003. (Rec. at 27.) On January 24, 2003, Townsend filed a timely request for a review by an Administrative Law Judge ("ALJ") and was heard before ALJ Daniel N. Shellhamer on January 21, 2004. (Rec. at 38.)

Judge Shellhamer denied Townsend's claim on March 26, 2004, concluding that Townsend "has not been under a disability, as defined in the Social Security Act, as amended, at any time since her alleged onset date of disability, i.e., January 14, 2002 through the date of this decision." (Rec. at 17.) Townsend requested review by the Appeals Council, but the Appeals Council denied her request on December 10, 2004, making the ALJ's determination the Commissioner's final decision. (Rec. at 4-7, 46-48.) See Sims v. Apfel, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.981, 422.210(a)). Townsend filed the present action before this Court on January 11, 2005.

## A.    Administrative Hearing

Townsend was the sole witness at the administrative hearing before Judge Shellhamer. She testified that her pain is "constant" in both knees, but worse in the left. (Rec. at 199.) She takes Advil on a daily basis to treat her pain, but does not take stronger medication due to low tolerance. (Rec. at 208, 209.) She reports constant "clicking" in her knees and claims that her leg will not "want to straighten out" after sitting for a long period. (Rec. at 199, 200.) Pain will occasionally travel up and down her legs without warning, and her left knee will sometimes "pop," causing her to fall if she does not catch herself first. (Rec. at 200-01.) Her physician is aware of her falls but has not yet prescribed a cane. (Rec. at 201.) Although

3

Townsend recently had a series of injections to "lubricate" her knees and delay a knee replacement surgery, the injections did not eliminate the pain. (Rec. at 209-10.)

Because of pain and stiffness, Townsend gets out of bed very slowly, has trouble getting dressed, and will usually lay her clothes down and slide her legs into them so she does not have to bend. (Rec. at 199, 207.) She spends her days "dallying around trying to do a little bit of housework." (Rec. at 206.) She is able to dust, prepare meals, and do laundry if her husband carries the laundry basket. (Rec. at 207, 208.) She can no longer bowl or play with her grandchildren. (Rec. at 206, 212.) Townsend can do her grocery shopping as long as she holds onto the cart for support, but typically her husband or daughter will accompany her to the store and carry her bags. (Rec at 194, 212.) She is able to drive a car, but only for short distances because her legs cramp. (Rec. at 193-94.)

Townsend testified that she is able to pick up and carry ten to fifteen pounds. (Rec. at 212.) She can walk ten or fifteen minutes "at a slow pace" and stand for thirty minutes before she needs to sit down. (Rec. at 193.) She cannot squat. (Rec. at 210.) She climbs the three steps outside her house by holding onto the railing and taking the steps one at a time, though she loses her balance and falls every couple of weeks. (Rec. at 192.) She testifies that she cannot sit for longer than thirty minutes

4

or her knees will hurt and be very stiff when she stands up. (Rec. at 210.) She testified further that twenty out of thirty days are "bad days," where she is essentially house-ridden, and must sit with her legs propped up in a reclining chair or up on the couch. (Rec. at 211.)

Townsend also testified that she suffers from depression due to the pain in her legs and because she can no longer be as active as she was. (Rec. at 201-02.) She claims that she has problems sleeping, which have worsened over the past year, and has a crying episode approximately once a week since her fall in September 2001. (Rec. at 203-05.) Her family doctor, Dr. Robert Renza, has prescribed Xanax and Ambien to assist with her sleeping and anxiety. (Rec. at 202.) Dr. Renza did not recommend that she see anyone for her mental problems. (Rec. at 202-03.) She has no trouble getting along with people. (Rec. at 205.)

She testified that her daycare work involved "[t]aking care of children, changing diapers, feeding them, [and] playing with them." (Rec. at 195-96.) As bank manager, a position Townsend held from 1983 until 1993 or 1994, she supervised daily operations and the tellers in the office, spending approximately two to three hours at her desk and the rest of the workday with the tellers behind their stations. (Rec. at 196-98.) Townsend then worked in business development, which involved "going to visit business people, bringing in more business, [and] going to

a lot of dinner and luncheons." (Rec. at 197.) In 1998, Townsend
transferred to the operations department, a job consisting of
work from the offices, such as data input of overdraft and ATM
information. (Rec. at 197-98.) Townsend testified that operations
department work is mostly a desk job, requiring the employee to
move between her desk and computer and the file cabinet, with
occasional heavy lifting of files. (Rec. at 198.)

B.   **Treatment History of Physical Impairment**

Approximately two days after her fall in September 2001,
Townsend sought treatment from her family physician, Dr. Renza.
(Rec. at 153.) X-rays were negative for acute injuries, and Dr.
Renza placed Townsend on anti-inflammatory medications. (Rec. at
153.)

Townsend began treatment with orthopedist Dr. Joseph Zerbo,
in October 2001. (Rec. at 119.) His reports indicate that she
complained of pain in her right knee, difficulty bending and
kneeling, pain with prolonged walking and discomfort at night.
(Rec. at 119.) Dr. Zerbo noted that Townsend was able to deal
with the pain and continue working in her home daycare. (Rec. at
119.) Her x-rays revealed some mild degenerative changes, but
were otherwise unremarkable. (Rec. at 119.) Dr. Zerbo recommended
an MRI and gave Townsend a DepoMedrol injection. (Rec. at 119.)
After evaluating Townsend again in November 2001, Dr. Zerbo and
noted that the DeproMedrol injections "did not significantly

6

help," and that both of Townsend's knees continued to bother her "on a regular basis." (Rec. at 115.) In December, Dr. Zerbo found that Townsend had "an obvious symptomatic meniscal tear on her right knee." (Rec. at 114.)

Townsend underwent bilateral arthroscopic knee surgery on January 14, 2002, at Shore Memorial Hospital. (Rec. at 103-06.) Approximately a week after the surgery, Dr. Zerbo noted that Townsend was "doing extremely well with both of her knees." (Rec. at 140.) There was no swelling, tenderness, or redness, and she had "full range of motion to the knees bilaterally." (Rec. at 140.)

Townsend continued to do well until February 2002 when she fell on her left knee. (Rec. at 138.) After her fall, Dr. Zerbo found "no significant joint effusion." (Rec. at 138.) Her left knee had "full range of motion," and there were "no signs of swelling or instability." (Rec. at 138.) Per Dr. Zerbo's recommendation, Townsend began physical therapy at NovaCare Rehabilitation. (Rec. at 138-39.) During physical therapy, Townsend reported that she "is able to push herself to be on feet all day" but "cannot squat/kneel." (Rec. at 133.) Her chief complaint was "numbness and weakness" in her left leg, but she noted "no predictability to pain and at times has no pain at all." (Rec. at 133.) By April 2002, Dr. Zerbo noted that the physical therapy was "significantly helping." (Rec. at 137.)

Townsend's left leg was producing "some pain or weakness," but she was "doing well with the right leg." (Rec. at 137.) Her knees showed no "significant swelling or joint effusion." (Rec. at 137.)

Dr. Zerbo gave Townsend samples of Vioxx in June 2002 because she "intermittently has knee pain with the underlying degenerative arthritis." (Rec. at 135.) In July 2002, Dr. Zerbo re-evaluated Townsend, whose left knee had been "significantly bothering her" for a month. (Rec. at 134.) He noted that her knee produced "pain with walking as well as crepitation." (Rec. at 134.) He determined that Townsend had "gonoarthrosis with periarticular swelling about the knee," which was "producing an antalgic gait." (Rec. at 134.) Dr. Zerbo's impression was "painful degenerative arthritis of the left knee," and he intended to "get her on a Hylagan injection protocol to help delay the need for knee replacement surgery." (Rec. at 134.)

In September 2002, Dr. Zerbo diagnosed Townsend with "a traumatically induced aggravation of an underlying degenerative condition in the knees bilaterally as well as a tear in the right medial meniscus," and opined that Townsend's symptoms, which "continue to bother her on a regular basis," were "permanent" and "produce physical restrictions." (Rec. at 128.) He noted that Townsend was "continuing with ongoing care for her degenerative arthritis," but "ultimately she may require further surgical

intervention in the form of knee replacement surgery." (Rec. at 128.)

In November 2002, after Townsend filed her request for DIB, Dr. Paul Steel evaluated Townsend at the request of the Administration. (Rec. at 153-55.) Townsend reported to Dr. Steel that "her knee is uncomfortable, particularly with standing for more than ten minutes." (Rec. at 153-54.) Dr. Steel observed that Townsend "sat in the chair in a normal attitude" and "arose without difficulty though with some favoring of her left knee." (Rec. at 154.) She "ambulated normally" and there was "no limp present, nor pain." (Rec. at 154.) Upon examination, Dr. Steel found that "full flexion is present in both knees." (Rec. at 155.) There was "no increased fluid in the knee joints" and "no increased temperature," but there was "with motion, a gritty crepitation which is somewhat uncomfortable to the patient." (Rec. at 155.) Deep knee bending was "uncomfortable" and "only performed through 75%[,] favoring the left knee greater than the right." (Rec. at 155.) Townsend was "capable of standing on her tip toes and in the erect position flex[ing] her trunk touching her ankles." (Rec. at 155.) Townsend performed straight leg raising tests without any difficulty and walked at a reasonable pace. (Rec. at 157.) However, she was unable to squat or walk on her heels or toes. (Rec. at 157.)

In December 2002, a state agency non-reviewing physician,

Dr. Wu, completed a physical residual functional capacity
assessment. (Rec. at 158-66.) Dr. Wu found, based on the record
before him, that Townsend was able to lift/carry twenty pounds
occasionally and ten pounds frequently, stand/walk with normal
breaks for a total of four hours in an eight hour workday, sit
with normal breaks for six hours, and push/pull without limits.
(Rec. at 159.) Dr. Wu indicated that Townsend was able to
"occasionally" climb stairs, balance, and stoop, but was "never"
able to climb ladders, kneel, crouch, or crawl. (Rec. at 160.)
She had no limitations with regard to reaching, handling,
fingering and feeling. (Rec. at 161.) Dr. Wu concluded that
Townsend's symptoms would "affect claimant's ability to maintain
pace and persistence at work." (Rec. at 163.)[1]

**B.   Treatment History of Mental Impairment**

Dr. Renza's treatment notes from 1998-2004 indicate that
Townsend complained of "stress at work" in February 1998. (Rec.
at 177.) Dr. Renza diagnosed her with "job related stress" and

---

[1] Dr. Zerbo reevaluated Townsend in February and July 2003,
and found that she "continues to deal with significant bilateral
knee pain secondary to the degenerative arthritis in the knees
bilaterally." (Rec. at 167.) The conservative care to help with
her knee pain "has not been very successful," and pain "continues
to restrict her in physical activities including activities of
daily living." (Rec. at 167.) Dr. Zerbo speculated that Townsend
would require bilateral total knee replacement surgery in the
future. (Rec. at 167.) However, as discussed in greater detail
below, this Court may not consider Dr. Zerbo's records from this
period because they were not included in the evidentiary record
before the ALJ.

referred her to a counseling program. (Rec. at 177.) In January
1999, Townsend again complained of "job stress," and reported
that it was "tough getting up in the morning," and that she had
"stress and feelings of depression." (Rec. at 177.) At that time,
Townsend was taking Xanax two times per week. (Rec. at 177.) Dr.
Renza diagnosed her with "anxiety related to depression,"
recommended an echocardiogram, and prescribed Prozac and Ambien.
(Rec. at 177.) Townsend again reported "stress due to work" and
"uncontrolled anxiety" on February 3, 1999, and Dr. Renza
prescribed Serzone. (Rec. at 177.) On February 24, 1999, Dr.
Renza noted that Townsend was seeing a counselor and that she
would also be seeing a psychiatrist. (Rec. at 176.)

       During the period between March 1999 and January 2004,
Townsend visited Dr. Renza with complaints of bronchitis, but did
not present symptoms of anxiety or depression during any of these
visits, except for a comment in January 2001 that she "felt
anxious making arrangements for surgery." (Rec. at 169-76.) Dr.
Renza did renew her Xanax prescription in December 1999, November
2001, October 2002, October 2003, and January 2004, and gave her
a two week starter pack of the antidepressant Serzone in June
2000, without any accompanying diagnosis. (Rec. at 176, 174, 173,
170, 168, 175.)

       On January 19, 2004, Townsend reported that she was having
problems sleeping, and could not sleep for more than one hour at

a time. (Rec. at 168.) Dr. Renza diagnosed her with "anxiety," renewed her Xanax prescription, and prescribed Ambien. (Rec. at 168.)

## II.  Standard of Review

District Court review of a Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 301, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). Evidence is not substantial if it is "overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A

12

district court may not weigh the evidence or substitute its conclusions for those of the fact-finder.").

## III. Analysis

To establish eligibility for DIB, the applicant bears the burden of demonstrating a "medically determinable physical or mental impairment" that prevents her from engaging "in any substantial gainful activity" for a continuous period of at least a year. § 20 C.F.R. § 416.905(a) (2003); Newell v. Commissioner of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The Administration employs a five-step sequential evaluation to ascertain whether the claimant is disabled, pursuant to 20 C.F.R. § 404.1520 and 416.920(b). The burden rests on the applicant to establish the first four factors: (1) she has not engaged in substantial gainful activity since the alleged onset of disability; (2) she has a severe impairment, having more than a minimal effect on her ability to perform basic work-related activity on a sustained basis; (3) her impairment or combination of impairments meets or is equivalent to an impairment listed in the regulations; or (4) if her impairment is not equivalent to a listed impairment, her residual functional capacity is such that she cannot perform her past relevant work activity. If the ALJ determines that the claimant can perform her past relevant work, the claimant is not disabled for the purposes of the Social Security Act ("SSA"). If she cannot perform her past relevant

13

work, the ALJ must assess whether she is capable of performing other work existing in the national economy. 20 C.F.R. § 404.1520.

In his Opinion of March 26, 2004, the ALJ concluded that Townsend had not been disabled under the SSA at any time through the date of decision on March 26, 2004. He found "claimant's allegations regarding her limitations" to be "generally credible, however not the extent that would render her totally disabled for any period of 12 consecutive months." (Rec. at 25.) He determined that Townsend had not engaged in substantial gainful activity since the alleged onset of her disability, and that her "degenerative joint disease of the knees and depression are severe impairments." (Rec. at 24.) He then found that the impairments do not meet or equal one of the listed impairments, and he concluded that she was able to perform her past relevant work as a bank officer. (Rec. at 24-55.)

To determine that Townsend could perform her past relevant work, the ALJ found, based on Townsend's testimony, that the position of bank officer "required her to walk and stand for a total of 1 hour each; sit for a total of 6 hours; stoop for a total of 1 hour; write, type and handle small objects for 8 hours; and lift/carry 10 pounds frequently, and 20 pounds occasionally." (Rec. at 24.) The ALJ further concluded, "after considering the record in its entirety," that:

> [t]he claimant retains the residual functional capacity
> to lift/carry weights of 10 pounds frequently and 20
> pounds occasionally; stand/walk for a total of 2 hours;
> sit for a total of 6 hours; and push/pull unlimitedly.
> She is able to occasionally climb, balance and stoop;
> and she had no limitations with regard to manipulative,
> visual, communicative or environmental functions. She
> is able to understand, carry out, and remember detailed
> instructions; to respond appropriately to supervision,
> coworkers, and usual work situations; and to deal with
> changes in a routine work setting.

(Rec. at 24.)

The ALJ reasoned that this residual functional capacity would
enable Townsend to resume work as a bank officer, and therefore
she was not entitled to DIB under the SSA.

## A.    Townsend's Depression

Townsend contends that the Commissioner erred in concluding
that her depression was not a severe impairment of at least
twelve months duration. In particular, she claims that the ALJ
failed to accord adequate weight to Dr. Renza's renewals of her
Xanax prescription and his undated letter attesting to her
anxiety and depression.

As an initial matter, Judge Shellhamer did deem Townsend's
depression a "severe impairment." (Rec. at 24.) He nevertheless
concluded that the depression does not inhibit Townsend's
residual functional capacity such that she could not resume her
prior relevant work. As Townsend presented absolutely no evidence
indicating any kind of significant functional limitation arising
from her depression, the ALJ could not have reasonably reached
any other conclusion.

15

To determine disability, the SSA "focuses on impairments as criteria, not medications." Diaz v. Commissioner of Soc. Sec., 89 Fed. Appx. 323, 327 (3d Cir. 2004). The mere presence of a mental disturbance does not indicate a disability. See Plummer v. Apfel, 186 F.3d 422, 434-35 (3d Cir. 1999) (citing Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988)). Thus, regardless of any prescriptions, the claimant bears the burden of demonstrating that her impairment "significantly limits" her physical or mental ability to do "basic work activities." 20 CFR § 404.1520(c).

Accordingly, Judge Shellhamer did not err in finding that Townsend's Xanax prescription did not establish that Townsend suffered from severe mental impairment for the requisite twelve-month duration. Dr. Renza's treatment notes from January 2002 to January 2004 indicate that although Townsend did visit his office for cough, congestion, and sore throat, she did not complain of mental difficulties until January 19, 2004. (Rec. at 23.) While Dr. Renza did occasionally renew Townsend's Xanax prescription, which she took to address her sleeping difficulties, he never formally diagnosed her with anxiety until this date. (Rec. at 23.)

Townsend provided no medical documentation or testimony indicating that her anxiety or depression affects her ability to work in any regard. Nor does any evidence suggest that the Xanax was insufficient to control Townsend's anxiety. Consequently, the

16

ALJ's finding that Townsend's anxiety and depression do not prevent her from resuming her past relevant work is supported by substantial evidence in the record.[2]

## B.   Townsend's Physical Impairment

Townsend also argues that the ALJ's residual functional capacity findings were not grounded in substantial evidence for failure to adequately consider Townsend's own testimony and the records of Dr. Zerbo. (Pl. Br. at 19.)

However, the ALJ is entitled to reject a claimant's subjective testimony if he finds it is not credible, and articulates reasons for so finding. Thompson v. Barnhart, 281 F. Supp.2d 770, 780 (E.D. Pa. 2003) (citing Schaudeck v. Commissioner of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999)). Deference must be accorded the ALJ's credibility determinations, so long as the ALJ's conclusion is supported by substantial evidence. Weber v. Massanari, 156 F. Supp. 2d 475, 486 (E.D. Pa. 2001) (citing Alvarez v. Sec'y of HHS, 549 F. Supp.

_____

[2] Townsend further contends that the ALJ accorded insufficient weight to Dr. Renza's undated letter stating that he had been treating her since 1988 for anxiety and depression, and that "recently she began re-experiencing anxiety-related symptoms including sleepless nights and periodic crying episodes . . . related to her chronic pain and severe physical limitation." (Rec. at 178.) However, Townsend does not explain how Dr. Renza's undated letter could establish that she experienced depression or anxiety for twelve months, or that the alleged mental impairment affected her work. Accordingly, any failure to consider Dr. Renza's letter had no bearing on the ALJ's determination and is, therefore, of no relevance to this appeal.

897, 899-900 (E.D. Pa. 1982)).

In this instance, the ALJ considered Townsend's allegations regarding her limitations and found them "generally credible, however not [to] the extent that would render her totally disabled for any period of 12 consecutive months." (Rec. at 25.) In particular, the ALJ found that Townsend's reported restrictions were "not fully consistent with the preponderance of the objective medical evidence of record, as well as the claimant's own testimony at the hearing." (Rec. at 22.)

Although the ALJ did not cite to any specific inconsistency, Townsend's testimony conflicts sufficiently with the record to support his determination. For example, Townsend testified that she was unable to continue working in daycare after her initial fall in September 2001, (Pl. Br. at 4; Rec. at 196); however, Dr. Zerbo noted in October 2001 that she was continuing her work, despite her pain. (Rec. at 119.) Similarly, her statement that she is house ridden for twenty of thirty days is entirely unsupported by the medical documentation. (Rec. at 211.) Consequently, Judge Shellhamer's finding that Townsend lacks credibility, to the extent that she claims inability to resume her work as a bank officer, is supported by substantial evidence and entitled to deference by this Court.

The ALJ also appropriately weighed the reports from Dr. Zerbo on the record before him. Although Dr. Zerbo indicated that

Townsend's knee pain continued to "restrict her in physical activities" in August 2003, the doctor noted no specific limitations and reached no conclusion in conflict with the ALJ's residual functional capacity determination.[3] (Rec. at 23.)

Lastly, Townsend argues that the ALJ overly relied upon the opinion of the state agency report. (Pl. Br. at 18.) However, The ALJ may consider the opinions of state agency medical consultants "insofar as they are supported by evidence in the case record," SSR 96-6p, 1996 WL 374180 (July 2, 1996), and nothing in the record suggests that the ALJ relied on the non-examining physician at the exclusion of the rest of the evidence. The ALJ's determination, including the extent to which he relied on the non-examining physician, was entirely consistent with the record; the only evidence Townsend raises to counter the ALJ's assessment is her own testimony, found not to be fully credible, and medical reports from Dr. Zerbo that were absent from the record before the ALJ. See supra n.3. (Pl. Br. at 19-20.)

---

[3] To the extent that Townsend claims this Court should consider Dr. Zerbo's reports from July 11, 2003, and June 10, 2004, it should be noted that these documents were not added to the record until Townsend submitted them to the Appeals Council for review of the ALJ's Opinion. (Rec. at 7.) As the Appeals Council denied review, this Court may not consider these reports because they constitute evidence outside the scope of the record before the ALJ. Fisher v. Massanari, 28 Fed.Appx. 158, 159 (3d Cir. 2002) ("[W]hen the Appeals Council has denied review, the district court may affirm, modify, or reverse the Commissioner's decision, with or without remand, but based only on the record before the ALJ.") (citing Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001)).

The ALJ's Opinion indicates that he thoroughly considered the entire record, including all medical reports and testimony, and logically and reasonably grounded his findings in the evidence. After specifically recounting and weighing all evidence of Townsend's condition, the ALJ reasonably concluded that Townsend had the "residual functional capacity to lift/carry weights of 10 pounds frequently and 20 pounds occasionally; stand/walk for a total of 2 hours; sit for a total of 6 hours; and push/pull unlimitedly." (Rec. at 25.) He then found that "the preponderance of the reports from the treating and examining physicians provide persuasive evidence" that her limitations have not precluded her from all work activity for twelve consecutive months. (Rec. at 23.) These conclusions are grounded in the record and supported by substantial evidence.

Accordingly, the ALJ's decision will be affirmed.

## IV.   Remand for Consideration of New and Material Evidence

Townsend also argues that her case should be remanded under 42 U.S.C. § 405(g) to permit the ALJ to consider additional evidence in the form of medical reports from Dr. Zerbo, dated February 24, 2003, July 11, 2003, July 14, 2003, and June 10, 2004,[4] that were not submitted before the ALJ's issued his decision. (Rec. at 7; Pl. Br. at 25.)

---

[4] Townsend offers no explanation as to how her doctor's findings of June 10, 2004, could affect Judge Shellhamer's determination that she was not disabled prior to March 26, 2004.

However, because of the "sound policy" of encouraging disability claimants to timely present all relevant evidence to the ALJ, <u>Matthews</u>, 239 F.3d at 595, the court may not remand unless the claimant demonstrates "new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Indeed, "if [this court] were to order remand for each item of new and material evidence, [it] would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand." <u>Matthews</u>, 239 F.3d at 595 (citing <u>Szubak v. Secretary of Health & Human Serv.</u>, 745 F.2d 831, 834 (3d Cir. 1984)).

Townsend offers no explanation for her failure to procure these reports prior to her hearing. This alone merits the conclusion that Townsend did not make the necessary showing of good cause. <u>Scatorchia v. Commissioner of Soc. Sec.</u>, 37 Fed. Appx. 468, 472 (3d Cir. 2005) (citing <u>Matthews v. Apfel</u>, 239 F.3d 589, 595 (3d Cir. 2001)). Since Townsend has failed to meet this requirement for the consideration of new evidence, her request for remand must be denied.

The accompanying Order shall issue today.


Dated: 3/31/06                       S/Robert B. Kugler
                                     ROBERT B. KUGLER
                                     United States District Judge

21